UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL T. McCAW,

      Plaintiff,                         Case No. 15-cv-12069
                                               Hon. Matthew F. Leitman

v.

CHARTER TOWNSHIP
OF WATERFORD *et al.*,

      Defendants.
_____/

## OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF #19) AND (2) DISMISSING STATE-LAW CLAIMS WITHOUT PREJUDICE

Plaintiff Daniel McCaw ("McCaw") is the former Chief of Police for Defendant Charter Township of Waterford ("Waterford" or the "Township"). McCaw's employment with the Township ended in March of 2015 when the Township's Police and Fire Pension Board (the "Pension Board") voted to retire him. McCaw now challenges his forced retirement under both federal and state law. In his federal claims, McCaw alleges that the Defendants (the Township and certain Township officials) terminated his employment without due process of law and in violation of his First Amendment rights. The Defendants have now moved for summary judgment on these claims (the "Motion"). (*See* ECF #19.) For the reasons explained below, the Court **GRANTS** the Motion. The Court further

declines to exercise jurisdiction over McCaw's remaining state-law claims and **DISMISSES** those claims without prejudice.

**I**

**A.    Facts Relevant to the First Amendment Retaliation Claim[1]**

From 2006-2014, McCaw served as Waterford's Chief of Police.  On the evening of July 19, 2014, McCaw was off duty when he noticed a series of campaign signs at an abandoned gas station located within the Township.  (*See* McCaw Dep. at 413-14, ECF #23-2 at 416-17, Pg. ID 1876-77.)  McCaw believed that the signs violated a local zoning ordinance, so he pulled into the gas station and began removing the signs. (*See id.*)

At about this same time, an on-duty Township police officer, Joseph Quaiatto ("Quaiatto"), drove by the gas station and observed an unidentified person removing the signs.  Quaiatto activated his police lights, pulled into the parking lot, and realized that the person removing the signs was McCaw. (*See id.* at 407-08, ECF #23-2 at 410-11, Pg. ID 1870-71.)  Quaiatto then spoke briefly with McCaw and left the gas station.   (*See id.*)

The in-car video system in Quaiatto's squad car captured his interaction with McCaw. (*See id.* at 410, ECF #23-2 at 413, Pg. ID 1873.)  After Quaiatto arrived

---

[1] As the Court must, it takes the evidence in the light most favorable to McCaw.

back at the police station, the video from his car was automatically uploaded to the police department's secure video system.

On August 22, 2014, a Waterford resident filed a Freedom of Information Act request seeking a copy of the video from Quaiatto's squad car (the "FOIA Request"). (*See* FOIA Request, ECF #19-21 at 2, Pg. ID 624.)   After the FOIA Request was filed, Defendant Gary Wall ("Wall"), the Township Supervisor, asked the Township's IT Director, Jared Black ("Black"), to retrieve a copy of the video. (*See* McCaw Aff., ECF #23-7 at ¶ 9, Pg. ID 2018-19.)   Under Wall's direction, Black then "ordered" another Township employee to "reveal the confidential [police department] administrative password" so that Black could access the video. (*Id.* at ¶ 11, Pg. ID 2019.)  Black "eventually located the video and made a copy at [] Wall's direction," and "Wall then instructed [the employee] not to tell anybody that he had been ordered to provide his confidential [police department] administrative password and a copy of the video." (*Id.* at ¶ 11, Pg. ID 2020.)

McCaw maintains that Wall should not have had access to the secure video system because access to that system is "limited to a very small group of police department employees with access to administrative usernames and a confidential . . . password." (*Id.* at ¶ 7, Pg. ID 2018.)  McCaw believed that Wall's access of the video was a security "breach," and he became "concerned about the possibility of other similar breaches."  (*Id.* at ¶ 23, Pg. ID 2025.)  McCaw decided to "rectify the

3

situation" by distributing a "written directive" to his department. (*Id.* at ¶ 23, Pg. ID 2025.)

On September 12, 2014, McCaw sent this "Directive for Computer Records & Password(s)" (the "Directive") to all police personnel. (*See* ECF #19-25.) McCaw sent the Directive as an attachment to a cover e-mail which stated as follows:

> All Personnel,
>
> Please be aware of One or more of the Waterford Police Department's computer, audio, video, digital, etc. programs/systems have been <u>Compromised</u>. You are Required to read the attached Directive and take Immediate Action.
>
> If you have any questions, contact your Supervisor Immediately.
>
> Daniel T. McCaw
> Chief of Police

(*Id.* at 2, Pg. ID 639; emphasis and capitalization in original).

The Directive "order[ed] all department personnel to reset their confidential passwords and maintain confidentiality in the future." (McCaw Aff. at ¶ 23, Pg. ID 1298.)  It further commanded each employee to send an e-mail "acknowledging" that the employee had "changed [his or her] password(s)," "read the [D]irective," and "underst[oo]d th[e] [D]irective." (Directive, ECF #19-25 at 3, Pg. ID 640.)  In addition, the Directive "institut[ed] and identif[ed] standards for the security and

4

integrity of software, reports, data, files, passwords and authorized permissions." (*Id.*) For example, the Directive prohibited employees from "us[ing] passwords, access[ing] a file, or retriev[ing] any stored communication unless authorized to do so by the Chief of Police or [his] designee." (*Id.*) Finally, the Directive told recipients that if they violated its commands, they could face "disciplinary action up to and including termination and criminal prosecution." (*Id.* at 5, Pg. ID 642.)

As described in more detail below, McCaw now claims that the Defendants unlawfully terminated his employment (in part) because he issued the Directive.

## B.   Facts Relevant to the Due Process Claim

The relationship between McCaw and the Defendants had been strained before the campaign-sign incident and the Directive, and those events caused it to deteriorate further. On September 25, 2014, Wall informed McCaw that he was "placing [McCaw] on Paid Administrative Leave pending an investigation by [the Township]." (ECF #19-31 at 2, Pg. ID 668.) In this notice, Wall informed McCaw that Waterford had hired outside counsel to investigate (1) McCaw's removal of the campaign signs and (2) complaints received from police department unions about the Directive. (*See id.*)

On January 30, 2015, Wall notified McCaw in writing that the "investigation ha[d] revealed . . . evidence supporting charges that [he] engaged in actions or misconduct which may justify [his] termination as Police Chief in Waterford

5

Township." (ECF #19-5 at 2, Pg. ID 287.)  Wall told McCaw that his actions violated certain Township policies and implicated, among other things, a Michigan statute commonly known as "Act 78" (M.C.L. § 38.501 *et seq.*)[2].  As relevant here, Section 14 of Act 78 classifies certain police officers as civil servants and provides that "a member of any fire or police department encompassed by this act shall not be removed, discharged, reduced in rank or pay, suspended, or otherwise punished except for cause." M.C.L. § 38.514(1).  Wall told McCaw that the Township would provide McCaw "an opportunity to respond in writing and/or in person to the charges" before the Township decided whether to terminate his employment. (ECF #19-5 at 2, Pg. ID 287.)

McCaw chose to respond in person.  On February 13, 2015, McCaw and his counsel met with Wall's designee, Waterford's Director of Human Resources Lou Feurino ("Feurino"), and a Township attorney.  (*See* McCaw Dep. at 331, ECF #19-9 at 87, Pg. ID 514.)  During this meeting, McCaw provided his side of the story and insisted that he did not behave improperly and should not be disciplined. (*See id.*)

Shortly after McCaw's meeting with Feurino, the Township concluded its investigation.  Wall determined, based on the findings of the investigation, that McCaw "violated [his] responsibilities as Chief [of Police] and engaged in a wide-

_____

[2] This statute is known as "Act 78" because it was originally enacted as 1935 Public Act 78.

variety of actions which [were] inimical to being Chief in Waterford Township."
(ECF #19-7 at 3, Pg. ID 409.)  Wall further concluded "that if [McCaw] were to
resume active employment with the Township, termination would be required"
under Act 78. (*Id.*)

However, the Waterford Township Board of Trustees (the "Board of
Trustees") chose not to terminate McCaw for cause under Act 78. (*See id.* 5-6, Pg.
ID 410-11.)  Instead, on March 9, 2015, the Board of Trustees applied to the
Pension Board to have that board end McCaw's service under Michigan's Fire
Fighters and Police Officers Retirement Act, M.C.L. § 38.551 *et seq.*, commonly
known as "Act 345."[3]  The Board of Trustees believed that the Pension Board had
the authority to terminate McCaw's employment under Section 6 of Act 345
because he was 60 years old. (*See id.*)  That Section provides that:

> A member who is 60 years of age or older shall be retired
> by the retirement board upon the written application of
> the legislative body, or board or official provided in the
> charter of the municipality as head of the department in
> which the member is employed. Upon retirement, the
> retirement board shall grant the benefits to which the
> member is entitled under this act, unless the member
> continues employment. If the member continues
> employment, the member's pension shall be deferred
> with service years of credit until actual retirement.

M.C.L. § 38.556(1)(b).

---

[3] This statute is known as "Act 345" because it was originally enacted as 1937
Public Act 345.

The next day, on March 10, 2015, Wall sent McCaw a letter notifying McCaw that the Board of Trustees had sought his retirement under Act 345. (*See* ECF #19-7 at 4, Pg. ID 410.)  Wall also told McCaw that "but for the action taken by the Township Board last night to request your retirement, I would [have been] left with no alternative but to terminate your employment immediately." (*Id.* at 4-5, Pg. ID 410-11.)

McCaw says that he first learned through the media that the Board of Trustees requested his retirement, but he acknowledges that he received Wall's March 10 letter within a "day or two." (McCaw Dep. at 346-47, ECF #19-9 at 91, Pg. ID 518.)  And by March 11, McCaw knew that the Pension Board had scheduled a meeting for March 17, 2015, to consider the Board of Trustees' application to retire him and terminate his employment. (*See id.* at 208-09, ECF #19-9 at 55, Pg. ID 482.)

On March 12, 2015, McCaw sent an e-mail to members of the Pension Board concerning the application to retire him.  (*See* ECF #23-20.)  McCaw said that he understood that the Pension Board was scheduled to consider the application at its March 17 meeting, and he asked the Pension Board to postpone that meeting because he would be unable to attend in person. (*Id.* at 2-3, Pg. ID 2116-17.)  McCaw told the Pension Board that he would be in Florida visiting his

ill sister. (*See id.* at 3, Pg. ID 2117.)  The Pension Board denied McCaw's request to adjourn the meeting.

McCaw's counsel then sent the Pension Board a letter in which McCaw formally objected to the Pension Board taking any action on the Board of Trustees' application to retire him. (*See* ECF #23-19.)  McCaw's lawyer "urge[d] the Pension Board to reject the action that the Board of Trustees [] requested." (*Id.* at 3, Pg. ID 2114.)  McCaw's counsel explained in detail McCaw's position that, as a matter of law, the Pension Board could not terminate McCaw's employment with the Township.  First, McCaw's counsel argued that McCaw's participation in the Township's "Deferred Retirement Option Plan" (the "DROP") prohibited the Township from "retiring" or terminating McCaw's employment. (*Id.* at 2, Pg. ID 2113.)  Second, McCaw's counsel argued that even if Act 345 authorized the Pension Board to "retire" McCaw, the Act did not authorize the board to terminate McCaw's service as Chief of Police. (*Id.* at 3, Pg. ID 2114.)  Counsel insisted that the term "retirement" as used in Act 345 does not mean a termination of "employment."  In relevant part, counsel argued:

> Although we presume that you are well aware of Chief McCaw's status in the Waterford Township Police-Fire Act 345 Retirement System, we want to make sure everyone is on the same page.  Chief McCaw is already in retirement status, having made an irrevocable election to Participate in the Waterford Township Police and Fire Retirement System Deferred Retirement Option Plan ("DROP") on November 29, 2011.  The Township

9

offered participation in the DROP plan to Chief McCaw and others by operation of an amended Township Ordinance. Your Board approved his participation in the DROP, with an effective date of January 1, 2012, continuing to January 1, 2017. We are placing you on notice that any change in Chief McCaw's retirement status, during the five-year period for the DROP, will be considered a breach of contract unless the Chief elects to resign his position and terminate his employment earlier.

. . . .

Retirement and employment are clearly separate issues. The distinction is readily apparent in Act 345 – including the section the Township Board and Supervisor have referred to in statements concerning their pending request to the Pension Board. That section [MCL 38.556(1)(b)] states that "Upon retirement the retirement board shall grant the benefits to which the member is entitled under this act, unless the member continues employment." (emphasis added). We believe that the Board of Trustees and Township Supervisor are asking the Pension Board to take an action in a manner that would affect, or is intended to affect, Chief McCaw's employment, and that the Township, its Board of Trustees, and Supervisor are prohibited from taking such action by Act 78 []. Furthermore, it is clearly Chief McCaw's position that any action taken by the Township, its subunits, boards, Supervisor and/or employees, that affects his employment under current circumstances would be unlawful, improper, in excess of legal authority, contrary to proper and lawful procedure, without support, discriminatory, and retaliatory.

(*Id.* at 2-3, Pg. ID 2113-14; emphasis in original.)

On March 17, 2015, the Pension Board met and considered both the Board of Trustees' application to retire McCaw and the arguments presented by McCaw's

counsel. (*See* ECF #23-21.)  The Pension Board approved McCaw's retirement, and it ended his employment with the Township as of March 9, 2015. (*See id.*) The minutes of the Pension Board's meeting provide as follows:

> The Board received correspondence from the Waterford Township Supervisor . . . indicating that the Township Board of Trustees adopted a Mandatory Retirement Resolution on March 9, 2015 which serves as an application to retire Daniel T. McCaw under MCL 38.556(b).  The Board also received correspondence from Mr. McCaw's attorney Lawrence B. Shulman . . . regarding Mr. McCaw's retirement.
>
> The Board recognizes that MCL 38.556(b) provides in pertinent part, "A member who is 60 years of age or older shall be retired by the retirement board upon the written application of the legislative body . . . of the municipality . . . in which the member is employment," and that Mr. McCaw has attained age 60.
>
> Wise moved to approve the retirement for Daniel T. McCaw . . . with the last day of employment being March 9, 2015, approved unanimously.
>
> Kazyak moved to receive and file the correspondence regarding Daniel T. McCaw . . . approved unanimously.

(*Id.* at 3, Pg. ID 2120.)

## C.    McCaw's Claims

On June 7, 2015, McCaw filed this action against the Township, Wall, and six other members of the Board of Trustees (Sue Camilleri, Margaret Birch, Anthony Bartolotta, Julie Brown, Karen Joliat, and Donna Kelly). (*See* Compl., ECF #1.)  McCaw filed a First Amended Complaint on September 21, 2015. (*See*

First Am. Compl., ECF #12.)  In the First Amended Complaint, McCaw asserts eight total claims: two federal claims under 42 U.S.C. § 1983 and six claims under state law.  McCaw contends that this Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 by virtue of his Section 1983 claims, and he asks the Court to exercise supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(a). (*See id.* at ¶ 3, Pg. ID 139.)

McCaw's first federal claim alleges that the Defendants violated his constitutional right to due process when they terminated his employment (the "Due Process Claim"). (*See id.* at ¶¶ 87-112, Pg. ID 163-68.)  McCaw claims that he had a "constitutionally and statutorily protected property interest in [his] continued employment" and that the Defendants interfered with this interest "without [providing him] due process of law" and without following "proper termination procedure." (*Id.* at ¶¶ 93, 103, Pg. ID 164, 166-67.)  McCaw further appears to allege that the Defendants interfered with his "constitutionally protected liberty interest" by "terminating him without a name-clearing hearing or other notice of the grounds for termination and an opportunity to respond." (*Id.* at ¶ 110, Pg. ID 167.)[4]

---

[4] In the Motion, Defendants sought summary judgment on McCaw's claim that they deprived him of his "liberty interest" in his good reputation by failing to provide him a "name clearing" hearing. (*See* Mot. at 33-34, ECF #19 at 42-43, Pg. ID 268-69.)  McCaw did not respond to that portion of the Motion in either his

McCaw's second federal claim alleges that the Defendants terminated his employment in retaliation for exercising his First Amendment rights (the "First Amendment Retaliation Claim"). (*See id.* at ¶¶ 114-22, Pg. ID 168-71.)   In this claim, McCaw alleges, among other things, that he had a First Amendment right to issue and implement the Directive:

> [McCaw], as a civil service employee, enjoyed a constitutionally and statutorily protected interest in his First Amendment right to freedom of speech, including, but not limited to, implementation of departmental policies and procedures on the general conduct of his employees, and including reporting alleged specific violations thereof to other officials for proper vetting and investigation.

(*Id.* at ¶ 118, Pg. ID 170.)

---

response to the Motion (*see* ECF #23) or his supplemental brief (*see* ECF #29). "Sixth Circuit jurisprudence is clear: a plaintiff is deemed to have abandoned a claim when [he] fails to address it in response to a motion for summary judgment." *Mathews v. Massage Green LLC*, No. 14-cv-13040, 2016 WL 1242354, at *12 (E.D. Mich. Mar. 30, 2016) (citing *Brown v. VHS of Michigan, Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013); *Hicks v. Concorde Career Coll.*, 449 Fed. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 Fed. App'x 522, 524-25 (6th Cir. 2006) (recognizing that the failure to respond properly to summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.*, 65 Fed. App'x 19, 24-25 (6th Cir. 2003)).   Thus, the Court considers McCaw's "liberty interest/name clearing" claim – which is a separate and distinct legal claim from his claim that a defendant interfered with a property interest in continued employment, *see Ludwig v. Ferris State Univ.*, 123 F.3d 404, 408-11 (6th Cir. 1997) – to be abandoned.

## II

On April 4, 2016, Defendants filed the Motion, seeking summary judgment on the First Amendment Retaliation Claim and the Due Process Claim. The Court held a hearing on the Motion on July 8, 2016. The parties thereafter submitted supplemental briefs to the Court. (*See* ECF ## 28, 29.)

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## III

To prevail on a First Amendment retaliation claim, a public employee must establish three elements.  *First*, the employee must show that he engaged in constitutionally protected speech or conduct.  *See Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).  *Second*, the public employee must show that his employer took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that lawful conduct."  *Id.* at 658.  *Third*, the employee must demonstrate a causal connection between the constitutionally-protected speech or conduct and the employer's adverse action – "that is, the adverse action was motivated at least in part by [the] protected conduct." *Id.*  The first element – whether McCaw engaged in protected speech – is at issue here.

A public employee's speech qualifies for First Amendment protection only if it satisfies *each* of the following three requirements:

> [1] *The "matters of public concern" requirement.* The First Amendment protects the speech of employees only when it involves "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 143 (1983). In *Connick* . . . the Court explained that not all employee speech is protected, only speech that "fairly [may be] considered as relating to" issues "of political, social, or other concern to the community." *Id.* at 146. . . .  When, by contrast, an employee's speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to it without "intrusive oversight by the judiciary in the name of the First Amendment." *Id.*

[2] *The "balancing" requirement.* If the employee establishes that her speech touches "matters of public concern," a balancing test determines whether the employee or the employer wins. *See Pickering [v. Board of Education]*, 391 U.S. [563,] 568 [(1968)]. . . .  In resolving the claim, the Court "balance[d] . . . the interests of the teacher, as a citizen, in commenting on matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." [*Id.*]

. . . .

 [3] *The "pursuant to" requirement.*  In the last case in the trilogy, a prosecutor reviewed a private complaint that a police officer's affidavit used to obtain a search warrant contained several misrepresentations. *Garcetti* [*v. Ceballos* ], 547 U.S. [410,] 413-14 [(2006)]. . . .  In rejecting [the public employee's] free-speech claim, the Court did not deny that the prosecutor's speech related to a matter of "public concern" under *Connick*, and it did not take on the lower court's reasoning that *Pickering* balancing favored the employee.  It instead concluded that the First Amendment did not apply.  "The controlling factor," the Court reasoned, "is that his expressions were made pursuant to his duties as a calendar deputy," making the relevant speaker the government entity, not the individual. *Id.* at 421 . . . . "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

. . . .

A First Amendment claimant must satisfy each of these requirements:  the *Connick* "matter of public concern" requirement, the *Pickering* "balancing" requirement and the *Garcetti* "pursuant to" requirement.

*Evans-Marshall v. Bd of Educ. of Tipp Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337-38 (6th Cir. 2010).

Defendants are entitled to summary judgment on McCaw's First Amendment Retaliation Claim because when McCaw issued the Directive, he was acting "pursuant to [his] official duties" and was "not speaking as [a] citizen[] for First Amendment purposes." *Id.* (quoting *Garcetti*, 457 U.S. at 421). This is clear from the text of the Directive and McCaw's cover e-mail. First, McCaw signed both documents as "Daniel T. McCaw *Chief of Police*." (ECF #19-25 at 2-5, Pg. ID 639-42; emphasis added.) Second, the Directive and cover e-mail were addressed to all "personnel" of the police department – an audience that McCaw would address as part of his official duties. Third (and more importantly), the Directive gave specific orders to employees of the police department – something that McCaw could only do in accordance with his official duties and could not do in his capacity as a private citizen. Fourth (and equally important), the Directive threatened disciplinary action against any employees who violated its commands, and that, too, is something that McCaw could do only pursuant to his duties as Chief of Police.

In addition, McCaw's own sworn statements in this litigation underscore that he issued the Directive pursuant to his official duties. In his affidavit, McCaw acknowledged that he issued the Directive because he "not *only had a duty but a*

17

*responsibility* to secure WTPD systems and protect the citizens of Waterford from incurred liability and the general public from unsecured evidentiary data being accessed and shared by unauthorized individuals." (McCaw Aff. at ¶ 28, ECF #23-7 at 13-14, Pg. ID 2026-27; emphasis added.)[5]

---

[5] In another portion of his affidavit, McCaw says that he told members of certain Township police unions that the issue of unauthorized access to the department's computer systems concerned him "as a tax paying citizen of Waterford," (McCaw Aff. at ¶ 43, ECF #23-7 at 19-20, Pg. ID 2032-33), but this statement does not create a material factual dispute precluding summary judgment on the First Amendment Retaliation Claim. That claim is based on the Directive, not on conversations that McCaw may have had with union members. McCaw's First Amended Complaint neither mentions any conversations with the union members nor alleges that the Township took any action against him based upon those conversations. (*See* ECF #12.) And McCaw's briefing on the First Amendment issue likewise focuses on the Directive and does not attach any legal significance to his discussions with the union members. (*See* ECF ## 23, 29.) Because the First Amendment Retaliation Claim is not based upon McCaw's discussions with the union members, it is immaterial whether McCaw told the union members that he had concerns as a "private citizen."

Moreover (and in any event), McCaw's affidavit makes clear that he communicated with the union members pursuant to his official duties, not as a private citizen. McCaw explains that his communications with the union members occurred within the context of his "effort to address [the unions'] concerns" about the Directive and about "the possibility of discipline to their members" (McCaw Aff. at ¶ 42, ECF #23-7 at 19, Pg. ID 2032) – an "effort" that he necessarily undertook pursuant to his duties as Chief of Police and *not* as a private citizen. In fact, during the same conversation in which he mentioned his concerns as a private citizen, McCaw explained that *"WTPD's concern* was to protect the public by securing WTPD systems by resetting the employee's and system's passwords," and he told the union members that "if they had any suggestions to improve the directive and/or process for protecting WTPD passwords and systems, [he] would welcome their input." (*Id.* at ¶ 43, ECF #23-7 at 19-20, Pg. ID 2032-33; emphasis added.) These statements underscore that McCaw was acting pursuant to his official duties when speaking with the union members.

Simply put, McCaw issued the Directive pursuant to his official duties, and therefore it did not amount to protected speech.  Accordingly, McCaw may not pursue a First Amendment retaliation claim based upon the Township's alleged response to the Directive. *See Weisbarth v. Geauga Park District*, 499 F.3d 538, 546 (6th Cir. 2007) (affirming dismissal of First Amendment retaliation claim where plaintiff spoke pursuant to job duties rather than "as a citizen"); *see also Haynes v. City of Circleville*, 474 F.3d 357, 364-65 (6th Cir. 2007) (reversing denial of summary judgment of First Amendment retaliation claim and holding that police officer's statements in written memorandum were "unprotected as a matter of law" because officer was "acting as a public employee carrying out his professional responsibilities" when he drafted the memo).  The Defendants are entitled to summary judgment on the First Amendment Retaliation claim.

## IV

## A

The Fourteenth Amendment prohibits "any state" from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.  When assessing a claim by a plaintiff who seeks to invoke the "procedural protection" of this amendment, a federal court "addresses two questions." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).  The first question "asks whether there exists a liberty or property interest which has been

19

interfered with by the State," and "the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

The Defendants contend that the Due Process Claim fails at "question one" because McCaw did not have a property interest in his continued employment at the time of his termination; McCaw strongly disagrees.  However, the Court need not determine whether McCaw had a protectable property interest in his continued employment because, as explained below, even if he did have such an interest, his claim fails at "question two" because "the procedures attendant upon [the] deprivation [of that interest] were constitutionally sufficient." *Id*.

The "root requirement" of due process of law is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original). "The predeprivation process need not always be elaborate, however; the amount of process required depends, in part, on the importance of the interests at stake." *Leary v. Daeschner*, 228 F.3d 729, 742-43 (6th Cir. 2000).  "Moreover, the sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review; if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required." *Id.*

20

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985)*,* the Supreme Court explained how these principles apply to the termination of a public employee who has a protected property interest in continued employment. The Supreme Court held that before a public employer may fire such an employee, the employer must provide notice and "some kind of hearing." *Id*. at 542. The hearing need not be "elaborate," but it must provide the employee with "[t]he opportunity to present reasons, either in person or in writing, why the proposed action should not be taken." *Id*. at 546. The Supreme Court declined to require additional pre-termination process where a public employee has an opportunity "for a full post-termination hearing." *Id*.

Although *Loudermill* addressed the process due where a public employer seeks to discharge an employee for misfeasance, the *Loudermill* framework also applies where a public pension board seeks to "retire" a public employee for other reasons. Indeed, the United States Court of Appeals for the Sixth Circuit applied *Loudermill* in that precise context in *Cremeans v. City of Roseville*, 861 F.2d 878, 882 (6th Cir. 1988). *Cremeans* provides important guidance concerning the process due to a civil servant with a property interest in continued employment who faces involuntary retirement proceedings before a pension board under Act 345.

Jack Cremeans ("Cremeans"), the plaintiff in *Cremeans*, was a patrolman with the City of Roseville. He suffered "a knee injury when he slipped and fell in a non-work related incident." *Id.* at 879. When he was unable to provide a doctor's note stating that he was fit for duty, the chief of police "petitioned [Roseville's] Retirement Board" to "retire[]" Cremeans and terminate his employment. *Id.* The chief filed the petition under Section 6 of Act 345 which provides that:

> upon the application of a member, or his department head, a member in service who has 5 or more years of service credit and who becomes totally and permanently incapacitated for duty by reason of a personal injury or disease occurring as the result of causes arising outside the course of his employment by the city, village, or municipality may be retired by the retirement board.

M.C.L. § 38.556(2)(e).

The Roseville Retirement Board then held a hearing on the police chief's application. At that meeting, Cremeans was given an opportunity to address the board, and he did so. *See Cremeans*, 861 F.2d at 879. At the conclusion of the hearing, the board voted to place Cremeans "on involuntary non-duty medical disability retirement." *Id.* at 882. Cremeans had an opportunity to appeal the retirement board's decision under Section 5 of Act 345, M.C.L. § 38.555, which authorizes review of such decisions "by writ of certiorari" (now called

superintending control),[6] but he chose not to appeal. *Id*. at 881, n.4.  Instead, he filed an action in federal court under 42 U.S.C. § 1983, in which he alleged that "the board members deprived him of his constitutional right to due process." *Id*. at 822.  A jury found in Cremeans' favor, but the Sixth Circuit reversed.

The Sixth Circuit applied the *Loudermill* framework and ruled that the retirement board afforded Cremeans all of the process that he was due under the Fourteenth Amendment.  The court held that "the concerns expressed by the [Supreme] Court in *Loudermill* were met" because Cremeans "clearly had notice as to why he was being considered for medical retirement, clearly knew about the medical evidence the Board was relying upon, and was given the opportunity to present his side of the story." *Id*.

As in *Cremeans*, the *Loudermill* concerns "were met" in this case.  McCaw "clearly had [pre-hearing] notice as to why he was being considered for [] retirement." *Id*.  He has acknowledged that several days before the Pension Board's hearing, he received Wall's letter advising him that the Board of Trustees had sought his retirement under Act 345 based upon his age. (*See* McCaw Dep. at

---

[6] Section 5 of Act 345 provides that a retirement board created under the Act "shall be a quasi-judicial body, and its actions shall be reviewable by writ of certiorari only."  M.C.L. § 38.555.  But Michigan courts no longer use writs of "certiorari" in this context.  Instead, the Michigan Court Rules have "replace[d]" writs of certiorari with what are known as "writ[s] of superintending control." *See* M.C.R. 3.302(C) ("A superintending control order replaces the writs of certiorari and prohibition and the writ of mandamus when directed to a lower court or tribunal.").  *See also In re Gosnell*, 594 N.W. 2d 90, 98 (Mich. Ct. App. 1999).

208-09, 346-47, ECF #19-9 at 55, 91, Pg. ID 482, 518.)   In addition, both McCaw's e-mail to the Pension Board asking the board to adjourn its consideration of his forced retirement and his lawyer's pre-hearing letter to the Pension Board show that McCaw and his counsel knew that the Pension Board was considering whether to retire him under Act 345 based on his age. (*See* ECF ## 23-19, 23-20.)

Most importantly, McCaw had an "opportunity to present his side of the story" to the Pension Board.   As noted above, his lawyer submitted a letter explaining in some detail – including legal citations – McCaw's position that the Pension Board lacked the authority under Act 345 to terminate McCaw's employment and that any termination would violate the terms of McCaw's participation the DROP.   (*See* ECF #23-20 at 2-3, Pg. ID 2113-14.)   McCaw did not have a chance to address the Pension Board in person, but the Pension Board satisfied its *Loudermill* obligation by permitting McCaw to submit his position "in writing." *Loudermill*, 470 U.S. at 546.

Moreover, McCaw had substantial *post*-termination process available to him. *See Leary,* 228 F.3d at 742-43 (explaining that the availability of post-deprivation procedures should be considered when assessing the sufficiency of pre-deprivation procedures and in the overall due process analysis).   Like Cremeans, McCaw could have challenged the Pension Board's decision under Section 5 of Act 345 (M.C.L. § 38.555).   As noted above, that statute authorized McCaw to

seek a writ of superintending control in a state circuit court to reverse the Pension Board's decision. Seeking such a writ would have been proper because McCaw contended that the board made two legal errors – terminating his employment without the authority to do so and breaching the terms of the DROP (*see* ECF #23-20 at 2-3, Pg. ID 2113-14) – and superintending control proceedings are used to address "questions of law" and to determine whether the decision-maker "exceeded [its] jurisdiction and proceeded according to law." *In re Gosnell*, 594 N.W.2d 90, 98 (Mich. Ct. App. 1999) (internal punctuation omitted). Indeed, superintending control proceedings under Section 5 of Act 345 "broadly" allow for review of "a retirement board's 'actions,' not just its judicial or quasi-judicial decisions." *Bay City Police and Fire Retirees v. Bay City Police and Fire Retirement Sys. Bd.*, 2006 WL 2457485, at *2 (Mich. Ct. App. Aug. 24, 2006).[7] And the Sixth Circuit in *Cremeans* highlighted that an involuntarily-retired police

---

[7] McCaw argues that under the governing Michigan Court Rule, M.C.R. 3.302, he could not have obtained a writ of superintending control. The rule provides that "[i]f another adequate remedy is available to the party seeking the order, a complaint for superintending control may not be filed." M.C.R. 3.302(B). McCaw says that his ability to file this civil action in this Court was an "adequate remedy" that would have barred him from seeking superintending control. He cites no authority for this proposition. (*See* McCaw Supp. Br. at 5, ECF #29 at 12, Pg. ID 2213.) And the Sixth Circuit has squarely rejected an argument just like this as "thoroughly unpersuasive" and "circular at best." *Collyer v. Darling*, 98 F.3d 211, 227 (6th Cir. 1996) (rejecting the argument that a due process plaintiff could not have obtained mandamus relief in state court – which was unavailable to a plaintiff with an adequate remedy at law – because he could have filed a § 1983 action).

officer may challenge the lawfulness of a retirement board's decision to retire him by seeking review under Section 5 of Act 345. *See Cremeans*, 861 F.2d at 882. Thus, McCaw is incorrect when he contends that he "was flat out denied any posttermination hearing." (McCaw's Resp. Br. at 33, ECF #23 at 46, Pg. ID 1450.)

In sum, McCaw had a meaningful opportunity to oppose the Pension Board's decision to terminate his employment before it occurred and a serious opportunity for post-termination review of that decision. Thus, as in *Cremeans*, McCaw did not suffer a deprivation of property without due process of law. *See also Dziuban v. Bd. of Trustees City of Saginaw Police Officers and Firefighters Retirement Sys.*, 07-12902, 2008 WL 183556, at *10 (E.D. Mich. Jan. 18, 2008) (holding that plaintiff failed to state a procedural due process claim where she had an opportunity to present her position to pension board and where she could have sought review of the board's decision under Section 5 of Act 345).

## B

McCaw's argument that he was denied due process focuses largely on the investigation into his alleged misconduct and the related disciplinary proceedings against him. He complains that Wall and Board of Trustees "fail[ed] to adhere to [the procedural requirements for disciplinary investigations and terminations set forth in] Act 78 in numerous ways." (McCaw's Resp. Br. at 22, ECF #23 at 35, Pg.

ID 1439.)   He summarizes the "numerous" procedural flaws in the disciplinary

proceedings as follows:

> Chief McCaw was denied any meaningful pretermination
> process. First, there was no "termination" through Act
> 78. The charges detailed in the January 30, 2015 letter
> were void under Act 78 and therefore Act 78 was not
> invoked. Further, Defendants never transmitted the
> charges to the Civil Service Commission to start the
> process required by Act 78. The only process afforded to
> Chief McCaw was the offer to allow Chief McCaw to
> meet with Defendant Wall or his designee to "respond in
> writing and/or in person to the charges and receive a
> review of the charge before me as the Appointing
> Authority or my designee" (Ex. 13; Ex. 1 at 331-350)
> This suggested meeting does not come close to
> comporting with the public hearing provisions of Act 78.
> The meeting described in Defendant Wall's January 30,
> 2015 letter was outside of the procedures set forth in Act
> 78 in that no decision had yet been made against Chief
> McCaw to remove, discharge, demote or otherwise
> impose a disciplinary sanction. Act 78 procedures
> provide protection once such a decision has been made
> and action has been taken, in which case the employee
> has a right to answer the charges and demand a public
> hearing before the Civil Service Commission, and to
> appeal an adverse decision of the Civil Service
> Commission to the Circuit Court. (Ex. I at 345-346, 370-
> 381) As evidenced by the January 30, 2014 letter, the
> inappropriately labeled a *Loudermill* hearing was
> explicitly an opportunity to address the charges in a
> private forum rather than public and with Defendant
> Township's Director of Human Resources and not the
> Civil Service Commission.

(*Id.* at 30-31, ECF #23 at 43-44, Pg. ID 1447-48.)

There are three flaws in this line of argument. First, McCaw's focus on the actions taken in connection with the disciplinary proceedings under Act 78 is misplaced. He was not terminated under Act 78 based upon the results of a disciplinary investigation or for any alleged misconduct; the disciplinary proceedings against McCaw ended without any final decision. Instead, McCaw was involuntarily retired based upon his age under Act 345, a wholly separate statute with its own procedures and requirements. Thus, even if the disciplinary proceedings were flawed, the alleged flaws in that process did not result in a deprivation of McCaw's property interest in continued employment.

Second, McCaw's focus on allegedly unfair practices by Wall and the Board of Trustees is misplaced. The Pension Board, not Wall and the Trustees, made the final decision to end McCaw's employment. Thus, it is the actions of that board that deprived McCaw of his claimed property interest in continued employment and that are most relevant to the Due Process Claim.[8]

---

[8] McCaw also notes that he did not have advance notice that the Board of Trustees was going to consider applying to the Pension Board to have him retired and/or was going to vote on whether to make that application. But, as described above, the Board of Trustees' decision to request that the Pension Board retire McCaw did not deprive McCaw of a property interest. Instead, it was the vote of the Pension Board that terminated McCaw's employment, and it is undisputed that McCaw had advanced knowledge of that hearing and the opportunity to address the Pension Board before it made that decision.

Finally (and most importantly), McCaw's focus on the Defendants' alleged failures to comply with the procedural requirements of state law is misplaced. In the context of a due process claim like McCaw's, a federal court is "not concerned with determining whether the procedure involved strictly complied with state law." *Cremeans*, 861 F.2d at 882. The question, instead, is whether the plaintiff "received constitutionally adequate process when he was placed on involuntary … retirement." *Id*. As explained above, McCaw did receive such process, and thus his due process claim fails even if certain steps taken by the Defendants did not strictly comply with state law.

McCaw has raised a number of serious questions as to whether the Defendants violated his rights under Act 78 and/or whether the Pension Board exceeded its authority under Act 345 when it terminated his employment. Those questions – on which this Court expresses no opinion – deserve careful consideration by a state court. But the alleged failures to comply with state law do not equate to a violation of the Due Process Clause.

## V

Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" over a state law claim where the court "has dismissed all claims over which it has original jurisdiction." And when "all federal claims are dismissed before trial, the balance of considerations usually will point to

29

dismissing the state law claims, or remanding them to state court if the action was removed." *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010).  That is the case here.  McCaw has not offered any persuasive arguments as to why his state-law claims should remain in this Court.  And the Court believes that the Michigan state courts are best suited to resolve the challenging questions of state law – under Act 78 and Act 345 – raised by McCaw's claims.  Accordingly, the Court dismisses McCaw's remaining state law claims without prejudice.

## VI

For the reasons stated above, **IT IS HEREBY ORDERED** that the Motion (ECF #19) is **GRANTED** as follows:

- Defendants are **GRANTED** summary judgment with respect to Counts I and II of McCaw's First Amended Complaint; and
- The remaining counts of the First Amended Complaint are **DISMISSED WITHOUT PREJUDICE.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 9, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 9, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113